THOS. GOGGAN & BRO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 103927. Promulgated September 26, 1941.

*Roy L. Arterbury, Esq.*, and *K. S. Mandell, C. P. A.*, for the petitioner.

*Wilford H. Payne, Esq.*, for the respondent.

**OPINION.**

SMITH: Section 44 (d) of the Revenue Acts of 1936 and 1938 provides in part as follows:

SEC. 44. INSTALLMENT BASIS.

  *   *   *   *   *   *   *

 (d) GAIN OR LOSS UPON DISPOSITION OF INSTALLMENT OBLIGATIONS.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange—the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange—the fair market value of the obligation at the time of such distribution, transmission, or disposition. Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received. The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.  * .* *

Our question under this issue is, therefore, whether during the taxable years 1936, 1937, and 1938 the petitioner "distributed, transmitted, sold, or otherwise disposed of" the above described installment contracts on the sales of pianos and electric refrigerators. The peti-

tioner's contentions are that it merely "pledged" these contracts with the finance companies as security for loans.

We do not have before us the specific provisions of petitioner's agreements with any of the finance companies. No written contracts were offered in evidence. Petitioner's vice president and treasurer testified that he did not remember whether there were any written contracts with the finance companies.

The evidence does show that in each taxable year the petitioner turned over certain of its installment sales contracts to finance companies and received either cash or a credit for the face amount of such contracts, less either a standard finance charge or a "hold-back" of a certain percentage of the contract price pending final settlement of the account, or both. In lieu of a finance charge the petitioner paid the W. W. Kimball Co. 6 percent interest on the balance of its open account in which credit for the contracts had been entered.

As to the electric refrigerator contracts, the procedure seems to have been that commonly followed by many retailers of automobiles and household appliances, under which the installment sales contracts are immediately turned over to finance companies or banks for cash.

Even prior to the enactment of section 44 (d), *supra* (first enacted in the Revenue Act of 1928), it was held in a number of cases that where installment obligations are sold or discounted at a bank, or otherwise disposed of, the transaction giving rise to the installment obligation is closed and the gain or loss must be reported in that year. See *Grace T. Mytinger*, 4 B. T. A. 896; *Packard Cleveland Motor Co.*, 14 B. T. A. 118; *Lucius H. Elmer*, 22 B. T. A. 224; affd., 65 Fed. (2d) 568; *Alworth-Washburn Co.*, 25 B. T. A. 140; affd., 67 Fed. (2d) 694; *Miller Saw-Trimmer Co.*, 32 B. T. A. 931. Referring to section 44 (d) of the 1928 Act, the court said in *Duram Building Corporation* v. *Commissioner*, 66 Fed. (2d) 253:

* * * That statute of course, is not controlling as to the petitioner's transactions in 1926; but we view it as merely an express recognition of what was equally true under the 1926 act by reason of the general provisions (sections 202–204 [26 USCA §§ 933–935]) with respect to the sale of property by a taxpayer. * * *

In *Elmer* v. *Commissioner*, 65 Fed. (2d) 568, the court found, sustaining the Board, that the transactions by which certain automobile installment sales contracts were placed with a finance company were sales, rather than loans with the contracts pledged as security. In *Alworth-Washburn Co.* v. *Helvering, supra*, the taxpayer, in the year following the sale of real estate, discounted the purchase money notes payable over a five-year period at the bank and received the face amount of the unpaid balance of the notes in cash. There, as in *Elmer* v. *Commissioner, supra*, the question turned upon the nature of the transaction between the taxpayer and the bank. The court said:

It is undoubtedly a fact that the terms "loan," "discount," and "sale," as applied to a transaction such as is involved in this case, are frequently so used by courts as to result in a rather vague and inexact distinction between them. * * *

But in the view we take of this case, it is not necessary we should be at pains to find a subtle distinction between the words we have discussed. * * * Whether the transfer of the notes received by petitioner as part of the purchase price for its property be denominated a loan, a sale, a discount, or a sale by way of discount, is not determinative of the rights of this case. The question rather is whether the tax statutes, fairly construed, make the money received by petitioner in the year 1927 gain or profits within the purview of section 213 of the Revenue Act of 1926 (44 Stat. 23, 26 USCA § 954).

The petitioner here points out that it guaranteed all of the sales contracts which it turned over to the finance companies and in case of a purchaser's default it was obligated to reimburse the finance company for the balance advanced on the contract. So, however, were the taxpayers liable on the notes which they discounted at the banks or turned over to finance companies in the *Alworth-Washburn* case and in the *Elmer* case.

The petitioner further relies upon the fact that it handled all of the repossessions of merchandise and reimbursed the finance companies for the balance due on the contracts. In *Elmer* v. *Commissioner, supra*, the seller repossessed the automobiles upon default of the purchaser "probably as its [the finance company's] agent" the court stated, and repaid the amount so realized to the finance company. We do not think it material that here the petitioner acted in its own behalf in repossessing merchandise upon a default in payment by the purchaser. While the contracts were in good standing all collections made thereon belonged to the finance company holding the contract, and the petitioner merely acted as agent for the finance company in making the collections.

As to the transactions involving the assignment of the electric refrigerator contracts, particularly, the evidence fails to show that the procedure followed by the petitioner differed in any material respect from that followed by one or more of the taxpayers in the cases cited above. Some of the piano contracts, those turned over to the W. W. Kimball Co., were handled in a somewhat different manner in that the petitioner paid interest on the credit advanced to it in lieu of a finance charge, but we do not think that this difference seriously affects the result. In all instances the petitioner realized in cash or its equivalent all or a substantial portion of the sale price of the article sold at the time when the sale contract was turned over to the finance company. This is enough, we think, to require the inclusion in the gross income of each year of the profits represented in such cash receipts. We therefore sustain the respondent in his determination that the installment obligations were distributed, transmitted, sold, or otherwise disposed of, within the meaning of section 44 (d) *supra*.

The petitioner alleges as error in paragraph 4 (c) of its petition the "Disallowance of sufficient depreciation on automobiles and trucks in 1938 to return capital invested which resulted in an additional tax of $33.13." Apparently this allegation of error was intended to put in issue the respondent's disallowance of the amount of $145.14 which the petitioner claimed in its return for 1938 as a loss on the sale of the Chrysler automobile which it traded in on the Buick. In disallowing the deduction the respondent held that there was no sale but an exchange within the meaning of section 112 (b) (1) of the Revenue Act of 1938 on which no gain or loss is recognized.

Section 112 (b) (1) of the Revenue Act of 1938 provides in part:

SEC. 112. RECOGNITION OF GAIN OR LOSS.

\*     \*     \*     \*     \*     \*

(b) EXCHANGES SOLELY IN KIND.—

(1) PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

The pertinent provisions of Regulations 94, which are the same as the corresponding provisions of Regulations 101, are:

Art. 112 (b) (1)–1. *Property held for productive use in trade or business or for investment.*— \* \* \*

No gain or loss is recognized if (1) a taxpayer exchanges property held for productive use in his trade or business, together with cash, for other property of like kind for the same use, such as a truck for a new truck or a passenger automobile for a new passenger automobile to be used for a like purpose, \* \* \*

Respondent's determination relative to the depreciation allowance for 1938 is in accord with the decisions of the Board in *W. H. Hartman Co.*, 20 B. T. A. 302; *George E. Hamilton*, 30 B. T. A. 160; *National Outdoor Advertising Bureau, Inc.*, 32 B. T. A. 1025; affd., on this point (C. C. A., 2d Cir.), 89 Fed. (2d) 878; *Graves, Cox & Co.*, 27 B. T. A. 546.

The cited cases hold that under the provisions of section 112 (b) (1) of the Revenue Act of 1938, or corresponding provisions of prior acts, no recognizable gain or loss results from the exchange of automobiles or trucks held for productive use in trade or business for other automobiles or trucks intended for a like use.

Petitioner conceded at the hearing of this proceeding that the Chrysler automobile in question was traded in and not sold and that no deductible loss was sustained on the trade-in. It asserted, however, that the excess of undepreciated cost over the trade-in

allowance should be allowed as additional depreciation in the year 1938. This contention is without merit. The allowance for depreciation depends upon the actual usage of the property. There is no evidence before us that the depreciation actually sustained on the automobile in question either in 1936, 1937, or 1938 was in excess of that set up by the petitioner on its books and claimed and allowed in the audit of its income tax returns. Certainly, the amount of the trade-in value allowed on an automobile which has been used in a trade or business for a given period can not be said to determine the amount or the rate of the depreciation to be allowed on it in any year of its use.

The evidence before us affords no basis for the allowance of any greater amount of depreciation on any of the automobiles in question than was claimed by the petitioner in its return and allowed by the respondent in the determination of the deficiency. Upon this issue the respondent is sustained.

Reviewed by the Board.

*Decision will be entered under Rule 50.*