## LONGCRICK et v KRUMHOLTZ et

Ohio Appeals, 2nd Dist, Montgomery Co

No 1416. Decided June 21, 1937

Orel J. Myers, Dayton, for plaintiff-appellees.

J. D. Chamberlain, Dayton, William G. Pickerel, Dayton, and Albert Dwyer, Dayton, for defendants-appellants.

## OPINION

By THE COURT

The above entitled cause is now, being determined on defendants' appeal on questions of law and fact from the judgment of the Court of Common Pleas of Montgomery County, Ohio.

By agreement of counsel, the cause is submitted in this court on a transcript of the evidence taken in the trial court, supplemented by additional testimony taken in this court.

The pleadings consisted of plaintiffs' petition, joint answer of defendants, Fred L. Krumholtz and Daniel B. Sullivan, separate answer of The Mutual Home and Savings Association of Dayton, Ohio, and plaintiffs' reply to the joint answer of Krumholtz and Sullivan.

W. Paul Wagner, Superintendent of Building and Loans of the State of Ohio, William G. Pickerel, as Deputy Superintendent of Building and Loans, in charge of the liquidation of the defendant The Mutual Home and Savings Association, and M. L. Goodman, liquidator in charge of the defendant The Mutual Home and Savings Association, were each made parties defendant, but filed no answer or other pleading. Leon O. Smith, as president, and Fowler Parrott, as secretary of the defendant, The Mutual Home and Savings Association, were also made defendants, but neither filed answer or other pleading.

R. G. Carpenter, alias John Doe, and J. R. Burkle, alias Richard Roe, were named in the petition as defendants, but were not served with summons, nor was any answer or other pleading filed on their behalf.

Plaintiffs sought a temporary injunction and, on final hearing, the surrender and delivery to them of two running stock accounts in their name, issued by The Mutual Home and Savings Association, and represented by stock books Nos. 65290 and 64889, of the total face value of $85.43 and $2675.00, respectively.

The joint answer of Fred L. Krumholtz and Daniel B. Sullivan avers that the said defendant, Fred L. Krumholtz, purchased the running stock accounts from the apparent owner and prays the court that on final hearing plaintiffs' petition be dismissed and so forth.

The answer of the defendant The Mutual Home and Savings Association of Dayton,

Ohio, was in the nature of an interpleader, the prayer of which asked the judgment and determination of the court as to its duties and obligations in the premises.

The following brief summary of facts will render understandable the nature of the controversy and the issues arising:

On August 15, 1934, and for a long time prior thereto, plaintiffs were the owners of two running stock accounts in The Mutual Home and Savings Association of Dayton, Ohio. These running stock accounts were evidenced by pass books, one numbered 65290, on which there was a balance due of $2675.00; the other, numbered 64889, on which there was a balance due of $85.43. On the above date, and for some time prior thereto, the defendant The Mutual Home and Savings Association of Dayton, Ohio, was in the hands of the State Superintendent of Building and Loan Associations, and was in charge of a liquidator appointed from said department. On the 9th day of August, 1934, a stranger came to the home of Clara Longcrick, one of the plaintiffs, introduced himself as a Mr. Naylor, stating that he was a representative of the State of Ohio, employed in the liquidation of The Mutual Home and Savings Association, and that he was checking the running stock books outstanding in said association with reference to locating the owners thereof. Mrs. Longcrick acknowledged that she had in her possession two running stock books and thereupon exhibited same to the stranger, who took the numbers endorsed thereon and then informed Mrs. Longcrick that the running stock accounts were being exchanged for deposit accounts. This stranger informed Mrs. Longcrick that he thought he could secure cash for the small account of $85.43 and that he would return at a later date. One week later this stranger returned with what purported to be a certificate of deposit from The Mutual Home and Savings Association, covering account No. 65290, in the amount of $2675.00, and purporting to be signed R. G. Carpenter, Trustee. He also advised Mrs. Longcrick that he was prepared to pay her in cash $85.43 in full settlement of running stock account No. 64889. The stranger also had with him blank assignments, which he stated to Mrs. Longcrick it would be necessary for her to sign in order that The Mutual Home and Savings Association might properly effect the exchange of running stock accounts for certificates of deposit. Mrs. Longcrick signed the assignments and delivered the same to the stranger, in exchange for which she received in cash $85.43 and the purported certificate of deposit. The assignments were signed by Mrs. Longcrick in duplicate. The blank assignments were the same forms generally used by the defendant The Mutual Home and Savings Association for transfers of running stock. Opposite the place for signatures was space for the signatures of two witnesses, and following the signature was a form of acknowledgment to be executed by a notary public.

At the time of the signing of the assignment by Mrs. Longcrick no one was present but herself and this stranger. After signing, she also signed a short memorandum of instructions to the notary public acknowledging her signature. This stranger then carried the assignments to a notary public in Greenville, Darke County, Ohio, and there Eugenia Minnich, a notary public, signed the acknowledgment as such and attached the notarial seal and also signed as a witness. There also appears to be a second witness. The purported executed assignments were identical in form and we herewith set out one in full:

"ASSIGNMENT

"For value received, I do hereby sell, assign, transfer and set over unto ........ whose address is ........ all my right, title and interest in and to .......... dollars ($2675.00) face value of running stock account O. 65290 in the MUTUAL HOME AND SAVINGS ASSOCIATION OF Dayton, Ohio, together with my right to receive any and all dividends payable on the amount hereby assigned.

"I hereby irrevocably authorize the Superintendent of Building and Loan Associations of Ohio, in charge of the liquidation of said association, or his duly appointed agent, to pay the amount hereby assigned and/or any and all dividends payable thereon to said assignee or his assigns in the same manner and to the same extent that I would be entitled to receive payment if this assignment had not been given.

"Dated at ........this ...... day of ......, 19....

"Clara Longcrick

"WITNESSED BY:

"M. Harragriff

"Eugenia Minnich.

"STATE OF OHIO }
                    }ss:
"County of Darke  }

"Before me, a Notary Public, in and for said county and state, personally came the above named Clara Longcrick and acknowledged the execution of the foregoing in-

strument to be his voluntary act and deed for the uses and purposes therein set forth.

"IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my notarial seal this 15 day of August, 1934.

"Eugenia Minnich,

"Notary Public.

"EUGENIA MINNICH,

"Notary Public, Darke

"Counties. My commission expires Aug. 11, 1937."

On this 15th day of August, 1934, a man giving his name as J. F. Burkle appeared at the brokerage office of Fred L. Krumholtz with the books representing the two running stock accounts, and the executed assignments, for the purpose of selling same. The defendant Mr. Daniel B. Sullivan was a clerk in the brokerage office of Mr. Krumholtz, and, according to the testimony of these defendants, the stranger opened the negotiations for the sale of such running stock with Mr. Sullivan. According to the testimony Mr. Krumholtz made an offer of the then market price, which was accepted and a check in the sum of $828.03 was issued by Mr. Krumholtz to J. F. Burkle on the Winters National Bank and Trust Company. The check is introduced in evidence and bears the endorsement "J. F. Burkle." It also bears the paid stamp of the bank and, according to the evidence of the officers of the bank, the amount of the check was charged against the account of Mr. Krumholtz.

Within a very short time Mrs. Clara Longcrick became suspicious of the transaction and in two or three days after her turning over the assignments and running stock accounts to this stranger, she contacted The Mutual Home and Savings Association and then found out that the stranger was a fraud and that all papers and documents either received by her or executed by her, were fraudulent in every particular.

When an employee from the office of Mr. Krumholtz afterwards presented the assignments and books representing the running stock to The Mutual Home and Savings Association for transfer, he then received the information as to the claim of Mrs. Longcrick that the books representing the running stock and the assignments were fraudulently procured. The association refused to recognize the purported transfer until such time as it should be judicially determined as to who were entitled to these running stock accounts.

The plaintiffs' petition contains the following allegations relative to the defendants Fred L. Krumholtz and Daniel B. Sullivan:

"That on said 15th day of August, 1934, Fred L. Krumholtz and/or Daniel B. Sullivan, claim to have purchased from said stranger said running stock book No. 65290 and said deposit book No. 64889; they state they did not know said stranger and are now unable to locate him.

"These plaintiffs are informed and believe and therefore allege that the said Fred L. Krumholtz and/or Daniel B. Sullivan paid no consideration whatsoever for said running stock account book No. 65290 and said deposit account book No. 64889.

"Plaintiffs therefore aver that said Fred L. Krumholtz, and/or Daniel B. Sullivan now have in their possession and control said running stock account book No. 65290 and said deposit account book No. 64889 in the Mutual Home and Savings Association, and threaten to, and unless enjoined by this court will, deliver and transfer the same to third parties, and these plaintiffs aver that if said accounts are transferred to innocent third parties, they will suffer irreparable damage for which they have no adequate remedy at law."

During the trial, the plaintiffs, over the objection of the defendants Krumholtz and Sullivan, presented evidence at length intending to support the claim that certain writings on the assignments, the purported stock certificate or deposit certificate and the endorsement on the Krumholtz check were the writing of Daniel B. Sullivan. Thereby the claim is made that the defendant Daniel B. Sullivan and the stranger acted together in perpetrating the fraud on Mrs. Longcrick.

Counsel for the defendant Krumholtz, by motion in this court, raise the question that this evidence is improper to be considered for the reason that no such allegation appears in the petition and that the allegation of no consideration would not raise such an issue as against the defendant Krumholtz. It appears from the record that the defendants did introduce evidence at great length touching this charge against the defendant Sullivan.

Defendants' motion will be overruled.

In the lower court no finding was made and the court did not, in any sense, base its judgment on this claimed fraudulent conduct of Sullivan. We will take up, consider and determine this branch of the

case before considering the remaining question.

The defendant Sullivan, while on the stand as a witness, was requested to and did a number of times write different names. These were R. G. Carpenter, the original of which was the purported signature on the certificate of deposit; J. F. Burkle, being the purported endorsement on the Krumholtz check; Hannagriff, being one of the purported signatures as witness on the asignments, and others, all of which appear in the exhibits attached to the transcript of the evidence. In addition, enlarged photostatic copies are made of some of the sample writing of these names by Mr. Sullivan and also the Krumholtz check and the endorsement, and the name R. G. Carpenter, purporting to be signed on the certificate.

Counsel for plaintiffs also called three expert witnesses, each of whom give testimony in effect that the same person who wrote the name R. G. Carpenter on the certificate signed the endorsement on the back of the Krumholtz check, and that the sample writing, as identified as that of Mr. Sullivan, was written by the same person who wrote the name on the certificate of deposit and the endorsement on the Krumholtz check.

In one of the assignments appeared the figures No. 64889, that being the number on one of the books representing the running stock issued to Mrs. Longcrick. The check issued by Krumholtz bears the number 889. All of plaintiffs' witnesses say that the same person who wrote the last three figures in 64889 in the assignment also wrote the figures 889 on the Krumholtz check. Mr. Sullivan says that he wrote the number 889 on the check.

Counsel for defendants introduced writing experts and submitted to them all the various writings of names and others and after comparison of the writing of names admitted to be made by Mr. Sullivan with the purported signature on the certificate and the endorsement on the Krumholtz check they in substance say that the defendant Sullivan did not write the name R. G. Carpenter on the certificate or the endorsement on the Krumholtz check. Three of defendants' witnesses did state that in their judgment the figures 889 in the assignment and the figures 889 on the check were written by the same person. One of the expert witnesses for the defendants says not.

We have very carefully examined and re-examined all the evidence, including the exhibits, touching the question of signatures. No member of this court would care to qualify as an expert on handwriting. We probably have as much knowledge on the subject as the average man of affairs. That there are certain similarities is apparent even to the layman, but there are also apparent dissimilarities. In one investigation we are aided by the testimony of these experts, those testifying for plaintiffs pointing out the characteristic similarities and those for the defendants the characteristic dissimilarities. From the entire record we are unable to arrive at the conclusion that the evidence preponderates in favor of the plaintiffs.

The evidence presented by Mr. Sullivan of his previous good reputation and character prompts us to act with the greatest caution, yet at the same time we have in mind that many individuals of good character and reputation finally fall and commit offenses of very serious character. Of course, every man of good character and reputation stands better in any court than does the individual with a bad one.

The second and only remaining question is whether or not the defendant Krumholtz has title to the running stock accounts in question.

So far as concerns running stock account No. 64889, in the amount of $85.43, it appears conclusively from the record that Mrs. Longcrick received payment in full, and for this reason, if no other, no relief can be granted as to this small running stock account.

Counsel for plaintiffs refer to the following decisions of the Supreme Court, which it is asserted support their claim for relief:

Hamet v Letcher, 37 Oh St 356-359;

Frank v Ingalls, 41 Oh St 560.

The first case cited involved a transaction for the sale of hogs. A man by the name of Rohner appeared at the farm of the plaintiff, Hamet, representing that he was buying for Letcher & Co. The sale was consummated and a small cash payment made. It proved to be a fact that Rohner was not representing Letcher & Co., but, after acquiring possession of the hogs, he sold them to Letcher & Co., as his own. Later, when Hamet went to Letcher & Co. to collect his balance, he then for the first time learned the true situation. Hamet then brought his action against Letcher & Co. to recover on the ground that the title had never passed from him. Judgment was in his favor.

The second case (Frank v Ingalls, supra)

can be fully understood by quoting Syllabi 1 and 2:

"1. When the possession of a railroad ticket, which entitles the holder to one first class passage between points named therein, has been fraudulently obtained from the company, a person purchasing such ticket from the holder thereof, although for value and without notice of equities, acquires no title thereto."

"2. An agent authorized to sell such tickets, and stamp and deliver the same upon receiving pay therefor, cannot bind his company by stamping and delivering such tickets, without the knowledge of its proper officers to a third person, to be sold by him, and to be paid for when sold."

We understand that the lower court buttressed his finding and judgment on the two cases above referred to.

If this were an original action we would be very glad to follow the two cases above cited. However, the Supreme Court seems to have established a different rule where the transaction pertains to choses in action. This court had under consideration a somewhat analagous situation in the case of Stabler v Peterson et, Court of Appeals of Shelby County, Ohio, the opinion being released April 23, 1937, (24 Abs 496). The only marked difference in the instant case and the cited case was that in the Stabler case the chose in action was certificates of deposit and pass book deposits instead of running stock. Before releasing our opinion in the Stabler case we had the benefit of the briefs and oral arguments in the instant case and therefore considered all the authorities cited in both cases. We held in the Stabler case that the certificates of deposit and pass book deposits were choses in action and that the regular and usual method of transfer was by assignment; that the certificates of deposit and pass book deposits having been assigned in blank and in the hands of innocent purchasers for a valuable consideration, denied the granting of any relief to the Stablers. In the main, we based our decision on the following cases:

Combs v Chandler et, 33 Oh St 178;
Edgar v Haines et, 109 Oh St 159;
Hopple v Cleveland Discount Co., 25 Oh Ap 133, (6 Abs 41).

The syllabus in the case of Combs v Chandler et, supra, reads as follows:
"1. A bona fide purchaser, for value, of a non-negotiable chose in action, from one upon whom the owner has, by assignment, conferred the apparent absolute ownership, when the purchase is made upon the faith of such apparent ownership, obtains a valid title as against the real owner who is estopped from asserting title thereto."

"2. B. makes and delivers his non-negotiable promissory notes to C., from whom they are obtained by fraud, misrepresentation, and without adequate consideration. The assignee, having thus obtained them, transfers them to W., who is a bona fide purchaser, for value, before due without notice: Held, C. can not reclaim the notes from W."

From the syllabus above quoted the nature of the assignment is not disclosed, but in the statement of the case, on page 178, we find the following:
"The endorsement when the paper was transferred was merely 'F. A. Combs, guardian'."

In this Combs case, it appears that the first assignor who was complaining of the fraud, delayed action for some two years and the basis of the court's conclusion might well have been based on this long delay. Wright, J., in delivering the opinion, does state the effective law by reason of the delay, but the syllabus does not seem to buttress the principle announced on this question. It is well recognized that the syllabus of the case states the law. The opinion is purely dicta. It is always proper to consider the statement of the facts as disclosed in the opinion so as to have a clear understanding of what the court had under consideration in formulating the syllabi. A careful reading of the syllabus will disclose that a bona fide purchaser for value of a "chose in action" where there is apparent ownership in the assignee through the action of the assignor, a valid title passes as against the real owner who is estopped from asserting his title.

In the case of Edgar v Haines et, supra, Chief Justice Marshall, delivering the opinion, uses the following language:

"The instant case is exactly parallel to the case of Combes v Chandler, 33 Oh St 178, and upon the authority of that case, as well as upon principle, the judgment of the Court of Appeals must be affirmed."

The third syllabus in the Edgar case reads as follows:
"3. Where E transfers to M a non-negotiable chose in action, which assignment

is induced by the fraud of M, and afterwards M transfers the same to K, and K thereafter assigns the same to S, all of which transfers are by indorsement and delivery, and both K and S pay a valuable consideration therefor without notice or knowledge of the fraud of M, the equities of S are superior to those of E, and the situation is a proper one for the application of the legal maxim that, where one of two innocent persons must sustain a loss from the fraud of a third, such loss must fall upon the one, if either, whose act has enabled such fraud to be committed."

In the case of **Hopple v Cleveland Discount Company, 25 Oh Ap 138, (6 Abs 41)** the 6th syllabus reads as follows:
"6. Where an instrument is in nature of a chose in action, bona fide purchaser takes it free from collateral equities, notwithstanding fact that he may be subject to defenses by obligor to which original owner was subject."

Of course, the obligor mentioned is the endorser in the cited case. The obligor would be the Building and Loan Association in the instant case.

Syllabus 8 of the Hopple case reads as follows:

"8. Indorsements in blank by payee of interim certificates, and delivery thereof to another for valuable consideration, was sufficient to transfer title to certificates, which could not be rescinded after transferee sold certificates to innocent purchaser for value."

In the Stabler case, supra, (Shelby County) as in the instant case, it was and is necessary to determine the effect of the assignment being made in blank. The assignment is set out in full in a former page of this opinion and it will be noted that no name is entered showing to whom the assignment is made, and this is what we mean by speaking of the assignment in blank.

We are referred to the Uniform Stock Transfer Act contained in §§8673-1 to 8673-22 GC, inclusive.

Sec 8673-1 GC refers to the subject of transfer of title to shares, and limits the method of transfer as provided in the section. §8673-1 GC reads as follows:

"Sec 8673-1 GC. **Transfer of title to shares.**—Title to a certificate and to the shares represented thereby can be transferred only,

"(a) By delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby or .

"(b) By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby signed by the person appearing by the certificate to be the owners of the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person."

"The provisions of this section shall be applicable although the charter or articles of incorporation or code of regulations or by-laws of the corporation issuing the certificate and the certificate itself, provide that the shares represented thereby shall be transferable only on the books of the corporation or shall be registered by a registrar or transferred by a transfer agent."

It will be observed that the above section refers to certificates and the shares represented thereby. The query naturally arises as to whether or not it may be given a construction to include running stock represented by pass books. If so, the section makes specific provision by assignment in blank.

In the case of Pacific National Bank v Eaton, 141 U. S. 227-234, the principle is laid down that the certificate is merely authentic evidence of title, but is not the stock itself, nor is it necessary to the existence of the stock. A person is a stockholder by paying for the stock to the company and being entered on the stock book as a stockholder. He may take out a certificate or not as he sees fit.

We do not find it necessary to determine the applicability of §8673-1 GC, for the reason that under the above cited decisions of our Supreme Court the rule of endorsement in blank is recognized independent of statute.

Possibly we have said more than is necessary on this question of assignment in blank, since very little, if any, argument is presented against the propriety of such assignment.

We have deep sympathy for the plaintiffs in this action. The existing depression through which Mrs. Longcrick and others in like positions were not able to secure from the financial institutions their

lifetime savings, made them an easy prey to the oily-tongued, designing stranger. Many depositors in building and loan associations, like Mrs. Longcrick and others, lost confidence in the people they had formerly trusted, and naturally they did not know to whom they could turn. The prospect of getting some money at once inspired their confidence and allayed their suspicions. That the individual who defrauded Mrs. Longcrick deserves the most severe penalties of the law, goes without saying, but he has vanished and nobody knows where he is or where he may be found. Many people would save themselves from this grief if they would firmly declare to themselves and adhere to it that they would never sign their name to any document and deliver it to a stranger. To this might be added that they would never turn over their property to a stranger. In the past few years innumerable people throughout the state have been defrauded, the victims being the holders of stock or certificates of deposit in closed building and loan associations. Relief could be granted to these victims if the perpetrator of the fraudulent acts would only retain the ownership and control of the securities. This they do not do, but hasten to dispose of them. Under the law, when an innocent third party makes the purchase, his equities are greater than those of the original owner.

This principle is so old as to become a legal maxim, and is so referred to in the third syllabus of the case of **Edgar v Haines, 109 Oh St 159.** The applicable portion of this syllabus reads as follows:

"And the situation is a proper one for the application of the legal maxim that, where one of two innocent persons must sustain a loss from the fraud of a third, such loss must fall upon the one, if either, whose act has enabled such fraud to be committed."

Applying this principle, it appears that the assignment signed by Mrs. Longcrick was regular in form and in fact, the exact form that was generally used by The Mutual Home and Savings Association for assignments. It is quite true that Mrs. Longcrick had no intention to make an assignment, but, on the contrary, thought she was receiving a certificate of deposit issued by the proper authorities. However, the fact remains that she did execute an assignment, regular in form, and delivered it and her stock books to this stranger.

Thereafter Krumholtz, without any knowledge of the fraudulent conduct of this stranger, purchased the stock and received the books and the executed assignment. Under such a situation, the law says that they may not be recovered.

Under this situation we have no alternative but to find against the plaintiffs and dismiss their petition.

BARNES, PJ. and HORNBECK, J, concur.
GEIGER, J, concurs:

There is nowhere the slightest support of the claim, that Mr. Krumholtz was involved in any doubtful transaction. His connection with the case was that of a business man engaged in the legitimate and helpful dealing in certificates bought and sold on the open market, at established prices.

He was clearly an innocent purchaser, for valuable consideration, paid by him, of certificates coming to his office in what he had every reason to believe was a legitimate transaction in the usual course of trade.